GALIHER DeROBERTIS & WAXMAN LLP

| L. RICHARD DeROBERTIS | 3179 |
|---|---|
| ILANA K. WAXMAN | 8733 |
| ALLISON M. AOKI | 6912 |
| ALYSSA R. SEGAWA | 9798 |
| CHRISTOPHER L. JOHNSON | 11389 |

820 Mililani Street, Suite 505
Honolulu, Hawai'i 96813
Telephone: (808) 597-1400
Facsimile: (808) 591-2608
E-mail:    richard.derobertis@galiherlaw.com
           ilana.waxman@galiherlaw.com
           allison.aoki@galiherlaw.com
           alyssa.segawa@galiherlaw.com

NIDEL & NACE, P.L.L.C.

JONATHAN NACE (pro hac forthcoming)
District of Maryland Bar Number: 18246
CHRISTOPHER T. NIDEL (pro hac forthcoming)
Texas Bar Number: 24041596
ZACHARY A. KELSAY (pro hac forthcoming)
District of Maryland Bar Number: 30460
One Church Street Suite 802
Rockville, MD 20850
Telephone: (202) 780-5153
Email:    jon@nidellaw.com
          chris@nidellaw.com
          zach@nidellaw.com

Attorneys for Plaintiffs

*(caption continued on next page)*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| **ARIANA WYATT, Individually, and as Next Friend to her minor child, I.W.,** AND **MEREDITH WILSON**<br><br>Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES OF AMERICA**<br><br>Defendant. | Civ. Action No. 1:23-cv-65 (Federal Tort Claims Act)<br><br>COMPLAINT; SUMMONS |

TABLE OF CONTENTS

PAGE

NATURE OF THE CASE ...................................................................... 4

PARTIES.............................................................................................. 4

JURISDICTION AND VENUE............................................................. 4

FACTUAL BACKGROUND ................................................................ 6

The Red Hill Bulk Fuel Storage Facility ......................................... 6

The May 6, 2021 Fuel Leak (the "May Incident") .......................... 7

November 20, 2021 Contamination of the Drinking Water System (the November Incident) ....................................................................... 11

Plaintiffs' Home and Health Are Impacted by the Contamination Ariana Wyatt and I.W. ..................................................................... 14

Meredith Wilson .............................................................................. 18

Meanwhile the Navy Continues to Mislead and Coverup Toxic Contamination .. ................................................................................. 22

The Cavanaugh Report Identifies the Navy's Negligent Errors ..................... 23

CAUSES OF ACTION ....................................................................................... 25

COUNT I NEGLIGENCE ............................................................. 25

COUNT II NUISANCE ................................................................. 28

COUNT III TRESPASS ................................................................. 30

CAUSATION ................................................................................................... 30

NO EXCEPTIONS APPLY ................................................................................ 31

LIABILITY OF THE UNITED STATES ........................................................... 31

CONDITIONS PRECEDENT ........................................................................... 32

DAMAGES ...................................................................................................... 33

PRAYER FOR RELIEF .................................................................................... 34

## COMPLAINT

## NATURE OF THE CASE

1.      This complaint is filed pursuant to the provisions of the Federal Tort Claims Act, Title 28, U.S.C §§ 1346(b), 2671, *et seq.*, against the United States of America for negligence, nuisance, and trespass resulting in physical and emotional injuries where the government of the United States of America, if a private party, would be liable to the plaintiffs.

## PARTIES

2.      Plaintiffs, Ariana Wyatt and I.W., reside in Alabama and previously resided in Hawai`i, within the jurisdiction of this Court.

3.      Plaintiff Meredith Wilson resides in the State of Illinois and previously resided in Hawai'i within the jurisdiction of this Court.

4.      The Plaintiffs resided within homes exposed by the Red Hill leak from the Red Hill shaft that was owned and operated by the United States Department of the Navy during the time period alleged herein.

5.      Defendant is the United States of America.

## JURISDICTION AND VENUE

6.      This Federal District Court has federal-question jurisdiction because this action is brought pursuant to and in compliance with the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1402(b) because the United States is a defendant, and this is the judicial district where the acts or omissions occurred.

8.     This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. §2674 because the personal injuries and resulting damages of which the Complaint is made were proximately caused by the negligence, wrongful acts or omissions of representatives, employees, or agents of the United States of America working for the United States Department of the Navy, Army, or Defense, while acting within the scope of their office, employment, or agency under circumstances where the United States of America, if a private person, would be liable to the plaintiffs in the same manner and to the same extent as a private individual.

9.     The Defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated the Red Hill Bulk Fuel Facility and staffed its facilities and vehicles with its agents, servants, and employees.

## FACTUAL BACKGROUND

### The Red Hill Bulk Fuel Storage Facility

10.     Prior to the announcement of its closure on March 7, 2022, the Red Hill Bulk Fuel Storage Facility ("the Facility") supported the United States Navy's Pacific Fleet with fuel.

11.     The facility includes twenty steel-lined tanks encased in concrete inside of Red Hill, a volcanic mountain ridge.

12.     At capacity, the Facility is capable of storing up to 250 million gallons of fuel.

13.     Near the Facility are two drinking water shafts: the Red Hill shaft, operated by the Navy, and the Halawa shaft, operated by the city of Honolulu.

14.     The Red Hill shaft provides water to the military housing community of Joint Base Pearl Harbor-Hickam.

15.     In January 2014, because of a combination of negligent operator error and a negligent lack of oversight over military contractors, the Facility spilled 27,000 gallons of fuel.

16.     After the 2014 fuel spill, EPA and DOH entered into the Red Hill Administrative Order on Consent (AOC) with the Navy and Defense Logistics Agency. This enforceable agreement, required the Navy to take actions, subject to

EPA and DOH approval. Samples of groundwater are taken every three months and analyzed per the agreement.

17.    Water testing after the 2014 spill reported "safe" levels for drinking water sourced from both shafts, but during 2021, the Navy stopped producing samples during the correct quarterly timeframe.

## The May 6, 2021 Fuel Leak (the "May Incident")

18.    On May 6, 2021, one or more U.S. employees improperly and negligently conducted a fuel transfer procedure, which placed excess pressure on the pipeline and caused a spill of approximately 18,579 gallons of jet fuel. This spill is believed to have contained a combination of toxic volatile organic chemicals ("VOCs") and semi-volatile organic chemicals including, but not limited to, benzene, toluene, ethylbenzene, xylenes, naphthalene, methylnaphthalene, and others.

19.    The Red Hill Rover, the U.S. employee responsible for monitoring the tanks, heard a loud bang which was followed by fuel spraying throughout the area, covering the floor with fuel containing toxic and hazardous chemicals.

20.    Although unknown at the time, the fire suppression system sump pumps began to run during the spill and transferred up to 16,999 gallons of jet fuel into the fire suppression retention line.

21.     At the time, the Navy claimed the spill was approximately 1,618 gallons of jet fuel. An initial command investigation determined that this failure was due to "operator error"—a breach of the standard of care and safety protocol. This safety violation was not discretionary and involved no weighing of policy considerations.

22.     The Navy then claimed that the majority of the fuel had been recovered and denied that the leak contaminated any drinking water. But at a December 22, 2021, State of Hawai'i Department of Health (DOH) hearing, Captain James Meyer, USN, Commander of the Navy Facilities Engineering Command, revised the estimate of the amount spilled from 1,600 gallons to 19,000 gallons.

23.     The Navy identified the root cause of the May 6 incident to be a "disregard of proper valve sequencing dictated in the specific Operations Orders," as well as several other factors, all of which could have been prevented by proper adherence to the rules.

24.     This fuel remained in the fuel suppression line until the fuel suppression line ruptured on November 20, 2021.

25.     This ruptured pipeline resulted in fuel spilling into the tunnel system near the Red Hill drinking water system shaft.

26.     After visual observations reported at the Facility, the U.S. employees erroneously reported that "the design of the lower access tunnel and the piping within prevents release to the environment via a network of drains and sumps…there was

NO release to the environment" and "EPA reports no concerns due to no release to the environment."

27.    In the post-incident investigation, assessments concluded that the leak was only approximately 1,016 gallons of fuel and that most of the fuel went into available space in the pipeline instead of the fuel suppression sump pumps.

28.    Throughout the investigation, U.S. employees failed to account for the several thousands of gallons of jet fuel that were unaccounted for and were remaining in the fire suppression line.

29.    Following the May 6, 2021, spill, potential pathways into the environment were identified that include three soil vapor monitoring ports in the upper tank gallery, which are not oil-tight, and at least six imperfections in the concrete fuel oil recovery trench and floor.

30.    After the May 6, 2021, spill, Red Hill Monitoring Wells 2, 3, and 1R (RHMW01, RHMW02, and RHMW01R, respectively) all detected exceedances of the total petroleum hydrocarbons in the diesel range (TPH-d) above the Department of Health Environmental Action Levels (EALs).

31.    RHMW01, RHMW02, and RHMW01R are all located downgradient from the site of the May 6, 2021 pipeline breach.

32.    Most of these EAL exceedances were reported in RHMW02.

33.     On May 13, 2021 RHMW02 was tested at 1600 ug/l, four times the EAL.

34.     By May 20, 2021, the TPH-d level had risen to 1700 ug/l.

35.     Two tests of the Red Hill water shaft in August 2021 revealed fuel at levels exceeding environmental action levels.

36.     On November 17, 2021, the TPH-d levels in RHMW02 continued to increase reaching 2500 ug/l TPH-d.

37.     The oil/residual range total petroleum hydrocarbons ("TPH-o") also indicated a serious contamination problem existed that was threatening the drinking water. Tests at the Red Hill Shaft showed elevated readings that exceeded environmental action levels on multiple occasions:



38.    The Navy did not report these tests to the State of Hawai'i until many months after their detection, in violation of Navy's statutory duty. They also did not reveal these elevated readings to Plaintiffs or to members of the public.

39.    If these readings were reported when discovered, Plaintiffs could have taken emergency measures sooner and mitigated or potentially prevented the harms that they have now suffered.

### November 20, 2021 Contamination of the Drinking Water System (the "November Incident")

40.    Following the May Incident, the Navy failed to take even its own necessary corrective actions.  For example, an October 2021 Mitigations Report in the wake of the May incident prescribed corrective actions, including proper construction of the pipeline system, safety alarms to be restored and updated to proper working order, and clear instructions to follow the existing rules set forth by the Department of Defense. The operators of the Red Hill facility did not implement the corrective actions outlined in the Mitigations Report. The failure to take the required corrective actions led to devastating results just weeks later in November 2021.

41.    In the lower access tunnel of The Facility, there is a 3.5-ton train with an attached passenger cart used for conducting physical checks of the tanks.

42.    On November 20, 2021, while the Rover was driving the train in the lower access tunnel, he negligently struck a fire suppression discharge pipe that

contained thousands of gallons of fuel and water from the May 6 Incident. The damage triggered a catastrophic spill that injected jet fuel into the Red Hill well, the drinking water source for the Plaintiffs.

43.    After observing a drain valve on the fire suppression system that should have been closed, the Rover observed that the paint on the train cart matched paint on the opened valve, confirming that he had struck the open valve with the train car.

44.    The Rover was covered with fuel while trying to stop the leak, which he described as "four safety showers on full blast at one time."

45.    The Navy claimed that there was no video footage of the event, however, footage of the event ultimately leaked and can be found at https://www.youtube.com/watch?v=GEGohRlLrSA&t=3s. A screen shot of this leak shows the incredible magnitude of the spill:



46.     Despite the Navy's emergency response to the leak, fuel continued to flow from the fire suppression system retention drain down the tunnel toward the groundwater sump pump.

47.     Some of the fuel in the tunnel was recovered but the remainder of the fuel entered the soil and bedrock near U.S. Navy Well 2254-01 (the Red Hill Shaft).

48.     From the Red Hill Shaft, the fuel entered the Joint Base Pearl Harbor-Hickam (JBPHH) water distribution system.

49.     Following the incident, despite the near-certainty that the drinking water system for Plaintiffs and others was significantly contaminated by these two events, the United States chose to maintain the narrative that the spill was contained.

This changed on or around November 28, 2021, when it received reports of a fuel smell in the Navy drinking water.

50.     Following these reports, the United States ceased pumping water from the Red Hill Shaft.

51.     After this second release of fuel into the water shaft, by December 8, 2021, TPH-d levels had increased to 142,000ppb.

## Plaintiffs' Home and Health Are Impacted by the Contamination Ariana Wyatt and I.W.

52.     Ariana Wyatt lived in military housing at Joint Base Pearl Harbor-Hickam with her husband and her daughter, I.W. from February of 2021 until June of 2022.

53.     During this time, the family used the water for showers, bathing, cooking and general consumption.

54.     The family did not use a filter and used the water directly from the tap, including for drinking, bathing, and cooking.

55.     Shortly after the May Incident, Ariana Wyatt began experiencing a range of health impacts. These started with severe headaches, including migraine headaches as well as accompanying neurological issues and blurred vision.

56.     By late summer 2021, Ariana Wyatt started experiencing severe gastrointestinal distress, suffering from extended periods of constant diarrhea. After

suffering from extreme pain below her ribs, she was ultimately found to have a swollen right kidney, also known as hydronephrosis. The headaches, gastrointestinal issues, and kidney swelling, and pain continued.

57.    During this time and throughout fall 2021, both Ariana and I.W. also experienced debilitating pain during urination along with other symptoms of a urinary tract infection, however diagnostic testing did not indicate the presence of an infection.

58.    When Ariana and I.W. went to the doctor, they were routinely told that they should increase their water intake because dehydration was a possible cause of their symptoms. At this time, one or more of the doctors noted that they had seen many patients from the base with similar issues and suspected an environmental cause.

59.    On or around November 17, 2021, Ariana experienced severe skin irritation and rashes on her face, scalp, and back. These continued for months until she left Hawai'i and moved to Alabama.

60.    I.W. began suffering from severe urinary tract issues that started in late summer of 2021. Despite being fully toilet-trained, she became increasingly unable to control her bladder and was frequently incontinent requiring multiple changes of clothing every day.

61.    In October 2021, I.W.'s teacher was noticing changes in her behavior, remarking that she became less "bubbly" and was becoming "more of a shell of a person."

62.    I.W. grew unusually tired and more fatigued throughout the day.

63.    By the end of October of 2021, I.W. had developed swelling in her neck and throat along with pain and Ariana took her to see a doctor for her these issues in November 2021.

64.    In or around November 2021, the family began noticing a chemical smell in their water.

65.    Ariana Wyatt relocated the family to a hotel on or around December 5, 2021.

66.    During December 2021, the Wyatt family spent Christmas and I.W.'s birthday in a hotel while waiting on the Navy to complete the decontamination of the drinking water as well as the remediation of the Wyatt's home.

67.    While relocated, they were only able to stay in hotels for ten-day increments during the cleanup, which resulted in them moving almost weekly from hotel-to-hotel until their return to base housing in or around the spring of 2022.

68.    On these routine visits to their home, the Wyatts noticed strong chemical odors throughout the home, which were worse in the upstairs portion of their home.

69.     I.W. was ultimately diagnosed with an underactive thyroid and was placed on medication. These medications have been unable to control her hormone levels and I.W. suffers from episodic periods of extreme fatigue, lethargy, and accompanying headaches and pain.

70.     In or around December of 2021, I.W. had recurring health issues related to the water.  She suffered from high fever, gastrointestinal problems, and other pain and discomfort causing her to go to the emergency room.

71.     By March of 2022, I.W.'s neurological problems increased in intensity, and she began losing her balance and would fall down. She also started complaining about pain in her ears.

72.     These neurological and endocrine-related issues remain ongoing, causing I.W. severe pain, fatigue, discomfort, anxiety, and the complete loss of normalcy, frequently missing school and other activities due to these health impacts.

73.     The Navy used water trucks, called "buffalos," to provide a temporary source of clean water to residents.

74.     But shortly after the Wyatt family began using the buffalos, the Navy detected high levels of bacteria in the buffalo water.

75.     After bacteria was detected in the buffalos, the Wyatt family was forced to use bottled water for drinking, washing dishes, and brushing teeth.

76.     The Navy directed residents to perform daily "flushes," which included running their hot water faucets for at least 20 to 30 minutes daily. The Navy then assembled a flushing team of junior enlisted military personnel to perform community flushes. They went door to door to run sink faucets, showers, dishwashers, and to drain the hot water heater. These flushes, which ultimately were deemed "community flushes" released volatile contaminants from the water into the air adding insult to injury further exposing Plaintiffs to additional chemical contamination and poisoning the Wyatt family.

77.     During these flushes throughout early 2022, Ariana Wyatt remembers that the entire neighborhood smelled like gasoline and that when military personnel drained their hot water heater into the backyard, that the water left a "rainbow sheen" in the yard.

78.     After several of these daily flushes, residents, including the Wyatt family, became concerned that it was unsafe for them to be in or near their neighborhood during these flushes.

79.     On or about July 2022, the Wyatt family relocated to Prattville, Alabama.

### **Meredith Wilson**

80.     Meredith Wilson lived in military housing at Joint Base Pearl Harbor-Hickam from June 2017 to March 2022.

81.    She used the water for showers, baths, cooking and consumption.

82.    In May 2021, when the Navy informed the Hawai'i Department of Health that there was a spill but that it had not affected the water, she could not smell or see anything unusual in the water.

83.    In October 2021, Meredith Wilson began experiencing several symptoms, including lightheadedness, dizziness, ophthalmological problems, a sensitivity to sounds and bright lights, hair loss, nausea, and her hands and feet would suddenly go numb.

84.    Soon thereafter, she began experiencing and was diagnosed with vertigo and told her that she needed to stay hydrated and commented that she was the fifth vertigo patient the doctor had had in two weeks and suggested that there could be an environmental cause to her symptoms.

85.    After she first experienced symptoms, she was constantly drinking water, hoping that by hydrating her symptoms would be relieved.

86.    In early November, she experienced an intense pulsing in her ears and the back of her head and began experiencing debilitating migraines, of which she had had no marked history.

87.    After developing the migraines, she went to an Ear Nose and Throat (ENT) doctor and underwent an MRI.

88.    Instead, the MRI identified a flattening of the pituitary gland.

89.     On November 29, 2021, the Navy made an official announcement that it was investigating the November 20, 2021 Incident, and reopening its investigation into the May 6, 2021 Incident, after reports of a chemical smell in military homes. On this day, she smelled gas coming from the kitchen faucet.

90.     Thereafter, the Hawai'i Department of Health warned citizens to stop using the water, and so she began drinking bottled water.

91.     Initially, the Navy informed residents that the water was safe to drink but then determined that residents could have the option of relocating to hotels during the cleanup or remaining in their homes and receiving a payment during the cleanup.

92.     The Navy provided the Wilson family with Temporary Lodging Assistance to relocate to a hotel while it attempted to clean the neighborhood.

93.     The Wilson Family decided to relocate the family to a hotel.

94.     The Wilson family spent over 100 nights in hotels.

95.     In December 2021, her neurologist concluded that her migraines were affecting her vestibular system and prescribed medicine.

96.     During December 2021, the Wilson family spent Christmas relocating to a new hotel because the first hotel wanted to use the room for high-paying tourists during the holiday.

97.    While visiting their home on January 28, 2022, a strong chemical odor was detected and persisted throughout their home.

98.    The Wilson family attempted to relocate, at the urging of their doctors, who provided two letters of recommendation to Air Force officials supporting a transfer.

99.    Despite the recommendations from the doctors, Air Force officials denied the Wilson family's request for relocation.

100.    The Wilson family decided that she would have to move back to North Carolina at her own expense to live with her parents—while her husband waited to be relocated—so that she could seek better medical care and remove herself from continued exposure to the Defendant's harmful contaminants.

101.    In June 2022, the Air Force stationed Mr. Wilson to Scott Air Force Base in Illinois.

102.    After he was restationed, Meredith Wilson was able to rejoin her husband and began treatment at Washington University School of Medicine in St. Louis, Missouri.

103.    Since her exposure to the Defendant's contaminants, Meredith Wilson has experienced numerous neurological issues including central auditory processing issues, constant anxiety, vertigo, the inability to see for periods of time, the inability

to drive a car, the inability to work a normal job, and hypersensitivity to sound, which prevents her from singing with her band and earn income.

### Meanwhile the Navy Continues to Mislead and Coverup Toxic Contamination

104.  After the November Incident, the public became increasingly aware of issues with the contaminated water.

105.  Beginning as early as Thanksgiving weekend, November 27-28, 2021, residents of military housing began to complain to the Navy and to the State Department of Health that there were issues with their water, including the smell of fuel, a visible sheen, and that the water was flammable.

106.  However, by November 30, 2021, ten days after the catastrophic November Incident, the Navy had failed to advise anyone on the water line that there had been a fuel leak impacting their water with toxic chemicals or warning them that they should not use, drink, or bathe in the water. The Navy merely held town halls that addressed complaints of odor but failed to disclose the events leading to the contamination or the evidence of contamination itself.

107.  In or around this time the Navy informed the public that there had been a spill in May but assured the public that it had not affected the water failing to acknowledge the true nature of the May and November Incidents.

108.   In January 2022, the Navy began recruiting junior enlisted personnel to perform the flushes of the community water system due to resident concern with performing these flushes.

109.   Later in January 2022, the Navy admitted that its contaminants, including but not limited to, jet fuel had leaked into the aquifer that supplies drinking water to Oahu.

110.   Throughout 2022, the Navy conducted several failed cleanup efforts prior to Plaintiffs' departure from the base.

### The Cavanaugh Report Identifies the Navy's Negligent Errors

111.   Admiral Samuel Paparo, USN, Commander of the Pacific Fleet, ordered a command investigation of the incident that was endorsed by him on January 20, 2022, and by the Vice Chief of Naval Operations on June 6, 2022. Though commissioned by the Navy itself, the Cavanaugh Report (the "Report") broadly confirms the findings of the first investigation.

112.   The official findings confirm the Navy's liability under the FTCA for both of these Incidents. "The Navy is responsible for the 6 May 2021 and 20 November 2021 fuel spills at the Red Hill Bulk Storage Facility…and subsequent water contamination…[h]uman error was the primary cause…which led to as much as 3,322 gallons of fuel contaminating the Navy drinking water system."

113.   This volume of unrecovered fuel was later increased to over 5,000 gallons.

114.   The Navy's own assessment attributes the Navy's failure to prevent and adequately respond to the May and November Incidents to a "lack of critical thinking, intellectual rigor, and self-assessment by key leaders at decisive moments [which] exemplified a culture of complacency and demonstrated a lack of professionalism that is demanded by the high consequence nature of fuel operations."

115.   Specifically, the report notes that the Fleet Logistics Center (FLC) Pearl Harbor Commanding Officer's decision to remove uniformed, military oversight of the day-to-day operations at Red Hill "significantly increas[ed] the risks associated with fuel handling operations," which the FLC Commanding Officer "failed to identify, mitigate, or directly address." This increased risk created a dangerous gap in oversight, which allowed "12 hours of fuel transfer evolutions on 6 May 2021" to be conducted without "a single uniformed military member" providing oversight.

116.   Furthermore, the Report finds that after the November Incident, Navy Commanding Officers "failed to exercise the sense of urgency, critical thinking, forceful backup, and timely and effective communication demanded by the seriousness of the situation."

117.   The Cavanaugh Report also explains that the Navy simply and incorrectly "assumed there was no risk to the drinking water system." This assumption had serious consequences for Plaintiffs and establishes legal liability on the part of the United States.

## CAUSES OF ACTION

118.   Ariana Wyatt brings each of the following causes of action on behalf of herself individually and on behalf of her minor child.

119.   Meredith Wilson brings each of the following causes of action for herself.

120.   Ariana Wyatt, individually and on behalf of I.W. and Meredith Wilson may be referred to collectively as "Plaintiffs."

## COUNT I: NEGLIGENCE

121.   Each of the preceding paragraphs is incorporated by reference herein.

122.   The United States owns and operates the Red Hill Bulk Fuel Storage Facility.

123.   The United States had a duty to exercise reasonable care in its operation of the Facility.

124.   The United States by and through its officers breached the duty to exercise reasonable care by:

a. Failing to adhere to proper procedures and valve sequencing causing the May Incident;

b. Failing to implement necessary, mandatory corrective actions after the May Incident and prior leaks into and throughout the system;

c. Failing to adequately investigate the release of fuel into the fire suppression retention line, including the failure to oversee the investigations of independent contractors;

d. Failing to notify the Plaintiffs that its monitoring wells detected contamination for at least eight months;

e. Failing to take corrective action when it knew or should have known of the fuel buildup in the PVC piping after the May Incident to mitigate or prevent the November Incident;

f. Failing to install steel piping and/or to replace piping with steel piping;

g. Failing to take necessary samples to determine the potability of water provided to Plaintiffs and to the public;

h. Failing to operate the Facility's train car with reasonable or due care, causing the release of jet fuel that was negligently discharged into and subsequently stored in the Facility's fire suppression retention line;

i. Causing jet fuel to escape into Plaintiffs' drinking water at JBPHH;

j.  Failing shut off water pumping from the Red Hill Shaft before Plaintiffs were exposed to contaminants in their water;

k.  Failing to effectively relocate Plaintiffs to alternative housing before exposure to contamination;

l.  Failing to provide alternative water immediately upon knowing that the water supply was threatened and/or contaminated with chemicals, including, but not limited to, jet fuel and its constituents;

m. Directing Plaintiffs to flush contaminated water through their homes, causing the release of and exposure to airborne contaminants;

n.  Other negligent conduct that will be determined through discovery.

125.   Plaintiffs have been injured as a direct and proximate cause of the United States' negligent acts and omissions, which breached their duty of care to Plaintiffs.

126.   As a result of the United States' negligent acts and omissions, which breached their duty of care to Plaintiffs, Plaintiffs have suffered substantial injuries and damages, including physical, mental and emotional distress.

127.   Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate them for the negligence of the United States.

## COUNT II:  NUISANCE

128.   Each of the preceding paragraphs is incorporated by reference herein.

129.   Plaintiffs during some or all pertinent times were, in lawful possession of their properties on the Red Hill Navy water line, and used them, or had the right to use and enjoy them, as residences or for other legitimate uses.

130.   The United States owned and materially controlled the Red Hill Bulk Fuel Storage Facility near Plaintiffs' properties and the water well that provided water to the Plaintiffs' properties.

131.   The United States is liable for creating a condition at the Plaintiffs' residences that substantially and unreasonably interfered with their right to use and enjoy their property. The United States' intentional, negligent, or otherwise improper actions, inactions, and other failures in operating the Red Hill Bulk Fuel Storage Facility were the legal cause of the nuisance suffered by Plaintiffs.

132.   The Plaintiffs' right to use and enjoy their properties has been impaired by the United States intentional, negligent, or otherwise improper actions, inactions, and other failures that resulted in fuel leaking from the Red Hill Bulk Fuel Storage Facility into its water well, contaminating the water delivered to the Plaintiffs' properties thereby causing a nuisance.

133.   The nuisance caused by the United States has substantially and unreasonably impaired the Plaintiffs' use and enjoyment of their property, has

caused inconvenience, decreased the quality of life, caused physical and mental discomfort, reasonable fear of disease, and adverse health effects.

134.   The United States has engaged in intentional and/or otherwise improper or negligent operation of the Red Hill Bulk Fuel Storage Facility, causing an unreasonable invasion of Plaintiffs' property interests.

135.   Defendant's conduct has resulted in the unreasonable invasion of the Plaintiffs' interests including the unreasonable impact, inconvenience, annoyance, loss of use and enjoyment, and other damages.

136.   The invasions, harms, and injuries complained of herein by the plaintiffs are substantial invasions, harms, and injuries to the Plaintiffs' health, both physical and mental.

137.   The United States knew or should have known that leaking fuel into the water supply would invade the Plaintiffs' properties and substantially impair the Plaintiffs' health and use and enjoyment of their properties.

138.   While knowing that technologies and methods were and are available to abate fuel the contamination caused by the Incidents, Defendant failed to abate the nuisance and its cause(s).

139.   Defendant's conduct described above constitutes a continuing abatable nuisance, which Defendant has failed to remedy within a reasonable period, and for which Defendant is liable.

140.  As a result of Defendant's liability for the nuisance, the plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

## COUNT III: TRESPASS

141.  Each of the preceding paragraphs is incorporated by reference herein.

142.  Defendant intentionally operated the Red Hill Facility and stored the harmful contaminants at the facility.

143.  Defendant had ownership and physical control over the harmful contaminants that entered Plaintiffs' property.

144.  Plaintiffs did not authorize or consent to Defendant's placement of harmful contaminants on their property.

145.  Plaintiffs had a legal right to possession of the property—where they lived as tenants—when Defendant's harmful contaminants entered or remained on their property because they had a valid lease agreement.

146.  As a result of Defendant's placement of hazardous chemicals on their property, Plaintiffs are entitled to actual and consequential damages.

## CAUSATION

147.  Each of the preceding paragraphs is incorporated by reference herein.

148.  But for the conduct of the federal officers at Red Hill, the Plaintiffs would not have suffered inconvenience, illness, and injury.

149.   The ingestion of the harmful contaminants that federal officers released into Plaintiffs' drinking water cause medical harm. These harmful contaminants are also capable of vaporizing and causing harm to Plaintiffs through breathing the air in their home.

150.   Specifically, Plaintiffs have suffered medical injury, inconvenience, economic injury, and trauma that was proximately caused by the acts or omissions of Defendant's employees.

151.   Plaintiffs are at an increased risk of future medical harm and will need medical monitoring for the associated long-term illnesses.

## NO EXCEPTIONS APPLY

152.   Each of the preceding paragraphs is incorporated by reference herein.

153.   None of Plaintiffs' claims are subject to any of the exceptions to sovereign immunity found in 28 U.S.C. § 2680.

154.   None of the Defendant's actions described above arose under the government's discretionary decisions or subject to policy decisions.

155.   The Plaintiffs are civilians, not enlisted persons and therefore, have not assumed the inherent risks or uncertainties associated with military service.

## LIABILITY OF THE UNITED STATES

156.   This case is commenced and prosecuted against the United States of America in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort Claims

Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages of which the Complaint is made were proximately caused by the negligence, wrongful acts or omissions of representatives, employees, or agents of the United States of America working for the United States Department of the Navy, Army, or Defense, while acting within the scope of their office, employment, or agency under circumstances where the United States of America, if a private person, would be liable to the plaintiffs in the same manner and to the same extent as a private individual.

157. Through the Federal Torts Claim Act, the United States has waived its sovereign immunity for the acts and omissions described here. *E.g., Evans v. United States*, 876 F.3d 375, 380 (1st Cir. 2017), *cert. denied*, 139 S. Ct. 81 (2018).

158. Defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated the Red Hill Bulk Fuel Facility and staffed its facilities and vehicles with its agents, servants, and employees.

## CONDITIONS PRECEDENT

159. Pursuant to 28 U.S.C. § 2675(a), the Plaintiffs timely presented their claims to the United States by submitting Forms SF-95 to the Vice Admiral Darse E. Crandall, Office of the Judge Advocate Office, General Tort Claims Unit Norfolk, 9620 Maryland Avenue, Suite 205, Norfolk, Virginia 23511-2949, via USPS Priority

Mail Express, on February 22, 2022. See Forms SF-95 and cover letters, attached as Ex. A.

160.    As of January 2023, all Plaintiffs have complied with all requirements for presenting their claims and the claims have been deemed denied pursuant to 28 U.S.C. § 2675(a).

161.    Plaintiffs have exhausted their administrative remedies under the Federal Tort Claims Act and have fully complied with the statutory prerequisites for bringing this tort action against the United States.

## DAMAGES

162.    As a result of the negligence of federal employees, agents, or representatives, Plaintiffs have sustained damages and injuries including:

a.  Past and future physical pain and suffering;

b.  Past and future mental anguish;

c.  Past and future medical, healthcare, and attendant care expenses;

d.  Past and future lost income and of earning capacity;

e.  Past and future physical impairment;

f.  Past and future loss of enjoyment and quality of life;

g.  Past and future loss of enjoyment of property;

h.  Nuisance damages, including inconvenience, illness, and fear;

i.  Out of pocket expenses;

j.  Loss of personal property;

k.  Costs;

l.  Prejudgment and post-judgment interest as provided by law, at the maximum legal rate; and

m. Such other and further relief to which the plaintiffs may be justly

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a.  Award Plaintiffs compensatory damages, in an amount to be determined at trial;

b.  Award Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses, or fees to which they may be entitled by law; and

c.  Grant Plaintiffs such other and further relief as this Court deems just and proper.

DATED: February 2, 2023

Respectfully submitted,

/s/ Ilana K. Waxman
L. RICHARD DeROBERTIS
ILANA K. WAXMAN
ALLISON M. AOKI
ALYSSA R. SEGAWA
CHRISTOPHER L. JOHNSON
**Galiher DeRobertis & Waxman LLP**


/s/ Jonathan Nace
JONATHAN NACE (pro hac forthcoming)
CHRISTOPHER T. NIDEL (pro hac forthcoming)
ZACHARY A. KELSAY (pro hac forthcoming)
**Nidel & Nace, P.L.L.C.**

*Counsel for Plaintiffs*

---

Ariana Wyatt, et al. v. USA; Civil No. 1:23-cv-65; United States District Court for the District of Hawaii; COMPLAINT; SUMMONS